Filed 7/31/14  In re C.N. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re C.N. et al., Persons Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E060422 |
| Plaintiff and Respondent, | (Super.Ct.No. RIJ1100659) |
| v. | OPINION |
| S.M., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Jacqueline C. Jackson, Judge.  Affirmed.

Marissa Coffey, under appointment by the Court of Appeal, for Defendant and Appellant.

Pamela J. Walls, County Counsel, Julie Koons Jarvi, Deputy County Counsel, for Plaintiff and Respondent.

In this appeal, S.M. (mother) appeals from orders terminating her parental rights as to her six children. Mother contends the juvenile court's conclusion, that the "benefit exception" under Welfare and Institutions Code[1] section 366.26, subdivision (c)(1)(B)(i), did not apply to prevent the termination of her parental rights, is not supported by substantial evidence. Instead, she contends the record contains substantial evidence that she did maintain regular visitation with her children, and the children would benefit from a continued parental relationship. We conclude the record does support the juvenile court's orders, and the court did not abuse its discretion by finding that the benefit exception did not apply.

I.

FACTS AND PROCEDURAL HISTORY

A.     *Section 300 Petition and Background to Jurisdictional Hearing*

On May 9, 2011, the Riverside County Department of Public Social Services (DPSS) filed a petition alleging mother and father[2] failed to supervise or protect their first five children, and the children were dependants of the court under section 300, subdivision (b). In particular, DPSS alleged the parents: (1) failed to adequately provide the children with medical and dental care; (2) failed to immunize some of the children, which resulted in their inability to attend school; and (3) failed to insure that some of the

_____

[1] All additional undesignated statutory references are to the Welfare and Institutions Code.

[2] Father is not a party to this appeal.

2

children, already enrolled in school, actually attended school. DPSS also alleged that father used controlled substances such as marijuana.

In a report prepared for the detention hearing, the social worker reported that in April 2011, she responded to a referral about alleged general neglect and physical abuse. The referring party said the parents hit the children with their hands or a shoe; pulled the children by the hair; and would not get up with the children or feed them until the afternoon. It was further alleged that the home was filthy, the older children were not attending school regularly, and the children were left without adequate supervision while father played video games and/or smoked marijuana.

The social worker attempted to visit C.N. and D.N. at their elementary school, but was informed the children were absent. The social worker learned that C.N. had been absent 19 days since the beginning of the school year and tardy 11 times; D.N. had missed 31 days and had been tardy 18 times. School records indicated that D.N. had missed eight days of school in October 2010 because his immunization records were incomplete. A school official told the social worker that it took the parents that many days to get D.N. the immunizations required. The same day the social worker visited the children's school, an anonymous call to the child abuse reporting line alleged that the children were not attending school because the parents did not want to get up in the morning and take them to school. It was also reported that the children were looking for food.

The following day, the social worker visited C.N. and D.N. at school. D.N. denied his parents hit or spanked him. Additionally, he told the social worker that he did not

attend school because "his parents just will not take him to school." C.N. told the social worker that he does not eat dinner at home, but that he eats cereal after school. The next day, the social worker spoke to C.N.'s teacher, who said that when she spoke to C.N. about his attendance, he replied, "my dad wouldn't get up."

During an unannounced visit to the parents' home, father told the social worker it was "too hard" for him to take the children to school because he and mother had only recently purchased a vehicle, he worked late nights, and he had a hard time getting up early. Father assured the social worker that things would improve now that he had a vehicle. Father admitted that he had disciplined the children by spanking them with a belt and by making the children kneel for a few minutes. However, father denied that he and mother would not get up in the morning to feed the children breakfast. Father indicated that he had not used marijuana "since last year." The social worker informed father that he and mother would have to take a drug test that same day. Father tested positive for the presence of marijuana. Mother tested negative for controlled substances.

The children's paternal grandmother and aunt told the social worker that they worried about the children. They said father would hit the children on their heads with his knuckle and called them stupid. The aunt said the parents constantly fought, and mother would simply leave the home without the children. She also reported that the parents threatened to beat the children if they told anyone about the fights. The aunt and grandmother also told the social worker that father stayed up late at night playing video games, he would not get up in the morning to feed the children breakfast, and he used marijuana and possibly methamphetamine. Although they denied that mother used drugs,

4

the aunt and grandmother told the social worker that mother would not get up in the morning to feed the children either.

Mother told the social worker that she suffered from seizures and had multiple doctor appointments. She explained it was difficult to take the children to school without a vehicle. Mother also said that she and father did not discipline the children. If the children misbehaved, they would merely tell them "no." She also told the social worker that the children have a balanced meal for dinner every night, and that the children eat cereal before going to bed because "milk helps them sleep." During a visit to the home two days later, the social worker told mother about father's positive drug test. Mother denied that father used marijuana in the home, but added that she does not know what he does when he is away. Father came home during the visit. He was surprised by his positive drug test and again denied using marijuana.

The social worker reported three of the children were behind on their immunizations, all of the children were behind in their medical and dental care, and the children did not appear to be adequately fed. Nonetheless, the social worker concluded that the children could safely remain in the home if the parents were provided with appropriate services. The social worker recommended the juvenile court find that the children came within the meaning of section 300, that the children not be detained, and that the parents be provided with services conditioned on drug testing.

At a detention hearing, the juvenile court made a prima facie finding that the children came within the meaning of section 300, subdivision (b), ordered that the children remain in the custody of the parents, and set a jurisdictional hearing. At the

5

jurisdictional hearing, the juvenile court declared the children to be dependants of the court pursuant to section 300, subdivision (b), again ordered that the children remain in the custody of parents, and set a review hearing.

B.    *Background to Section 387 Petition to Remove Children from the Parents'*
       *Custody*

In a status review report, a newly appointed social worker reported that mother had not maintained a stable home for the children during the review period. The children's paternal grandmother had accused mother of not properly caring for the children and eventually asked mother to leave the home. Mother and the children moved in with the children's maternal grandmother, but the social worker reported that the home was infested with cockroaches and was not stable for the children. The social worker received constant complaints from relatives that the children were not in school and that mother was not feeding the children.

During the review period, the parents failed to take C.N. to school every day and the school was in the process of completing a Student Attendance Review Board (SARB) referral. C.N.'s teacher told the social worker that C.N. had poor grades because of his lack of attendance, and that he would probably be an average or above-average student if his attendance improved. On October 12, 2011, the social worker called mother at 9:00 a.m. and learned that the children were still sleeping and not in school. During a home visit, C.N. told the social worker that he wanted to go to school because he likes to learn and see his friends. The social worker also reported that D.N. and A.N. had poor

attendance at school, and school officials were in the process of completing SARB referrals for them as well.

The social worker reported that mother had not made any progress toward completing her case plan and had failed to utilize the services available to her. However, the social worker did recommend that mother continue to receive maintenance services and that the children should continue to be in mother's custody.

In an addendum report filed before a review hearing, the social worker reported that mother had made some progress toward completing her case plan. The social worker learned from school officials that the SARB referrals for the children had been completed, and school officials had scheduled meetings with the parents. When the parents did not respond or appear for the meetings, the matter was referred to the district attorney's office to place the parents on a three-month attendance watch list.

At a review hearing conducted on February 9, 2012, the juvenile court found that the children were still dependants of the court under section 300, and family maintenance services were continued.

On March 29, 2012, DPSS filed a supplemental petition under section 387 alleging that the parents had failed to comply with their case plan. DPSS requested that the juvenile court order the children placed with their paternal grandmother. According to the petition, the parents had engaged in domestic violence in the presence of the children, they had failed to maintain proper dental care for the children, and they had not been successful at making sure the children attended school regularly. In a detention report filed the same day, the social worker reported that she spoke to C.N. during a visit to the

7

home. She was told that C.N. had been living with his paternal grandparents for "a while," and he liked living there because his grandmother woke him up in the morning, fed him breakfast, and took him to school. Before living with the grandparents, C.N. told the social worker that he had been living at "Tia's house" and sleeping on the living room floor. C.N. said that he wanted to stay with his grandmother, and asked the social worker to "please, please tell my mom and dad that." D.N. also told the social worker that he wanted to stay at his grandmother's house because his grandparents did not fight like his parents did.

At one point, mother took the three youngest children with her to live with her sister-in-law and left C.N. and D.N. with their paternal grandmother. She wanted to live with all five children at the grandparents' house, but the grandmother was no longer willing to allow mother to live there. The social worker talked to mother about her transient lifestyle, after which mother agreed that the best situation for the children would be for them to live with their paternal grandparents while she worked on her case plan. The social worker therefore took the children into her custody and placed them with their grandparents.

The juvenile court made a prima facie finding that the children came within the meaning of section 387, found the children were at a substantial risk of suffering physical or emotional harm if they remained in the parents' custody, and ordered the children detained. The court placed the children in the temporary custody of their paternal grandparents, ordered reunification services, and authorized supervised visits for the parents.

In a jurisdiction/disposition report filed in support of the section 387 petition, the social worker reported that, since being placed with their grandparents, the children had perfect school attendance, with C.N. appearing tardy only once. The social worker reported that the children were bonded with their paternal grandparents, having spent a lot of time with them over the years. The children adjusted well to their placement in the grandparents' home, and the grandparents reported that the children were happy and at ease.

The social worker reported that she had attended a supervised visit at a park between the parents and the children, and observed that the parents and children interacted positively. The parents failed to appear for a later visit, due to miscommunication with the grandparents, so the social worker referred them for weekly visits at the DPSS office. As of the April 30, 2012, jurisdiction/disposition report, mother had not made any progress toward completion of her case plan. The social worker also reported that the paternal grandmother was willing and able to adopt the children if the parents did not reunify with them.

At the hearing on the supplemental petition conducted on April 30, 2012, the juvenile court found that the children came within the meaning of section 387, and it sustained the petition. The children were determined to be dependants of the juvenile court, and the court indicated their current placement with the grandparents was appropriate. The court also ordered reunification services for the parents and continued supervised visits.

C.    *New Petition and Termination of Reunification Services*

In a six-month status review report filed on October 17, 2012, the social worker reported that mother continued to live a transient lifestyle and was not consistent in taking her seizure medication. The children continued to do well in their placement, and their school attendance was good. Mother made adequate though incomplete progress toward her case plan and visited the children regularly. The social worker also reported mother was pregnant.

On March 14, 2013, DPSS filed an amended petition alleging that newborn J.N. was a dependant of the court within the meaning of section 300, subdivisions (b) and (j), and alleged the parents had not complied with their case plan and had failed to reunify with the other children. DPSS also alleged that mother had unresolved mental health issues and refused to participate in or consent to appropriate treatment. Further, mother had engaged in criminal activities and had an outstanding arrest warrant.

In a status review report, the social worker recommended services to the parents be terminated and requested the juvenile court set a hearing for selection of a permanent placement, pursuant to section 366.26. The social worker reported the children continued to do well in school and in their placement with the paternal grandparents. However, C.N. told the social worker that he wanted to "go home." C.N. and D.N. were in therapy for issues related to loss and abandonment. Mother failed to utilize medical and reunification services, and she had failed to complete her case plan. The parents visited with the children twice a week, helped them with their homework and chores, and had attended C.N., D.N., and A.N.'s weekend soccer games. The paternal grandmother reported the visits went well.

On March 15, 2013, the juvenile court made a prima facie finding that J.N. was a dependant of the court under section 300, subdivisions (b) and (j), and ordered him detained. In a jurisdiction/disposition report prepared for the amended petition, the social worker reported that J.N. had been placed with his paternal grandparents and siblings.

In an addendum report filed on April 19, 2013, the social worker recommended that (1) the juvenile court sustain the amended petition and find J.N. to be a dependant of the court under section 300, subdivisions (b) and (j); (2) family reunification services not be offered to the parents with respect to J.N.; and (3) services should be terminated as to the other children. The court set a hearing under section 366.26 to choose an appropriate permanent placement for the children.

The social worker reported the parents had regularly visited the children twice a week, and again noted the visits went well. However, after J.N. was placed in the grandparents' home and visitation was increased to two extra hours a day, both the parents and grandparents complained about visits. A family member told the social worker that father would get angry at the grandmother if she did not drive him to the visits or loan him her vehicle. C.N. told the social worker, "[the parents] don't come when they say. They lie to us." When asked about this, the parents told the social worker it was difficult for them to visit because they had to take the bus and they were busy completing their services. The grandmother again expressed her willingness and desire to adopt the children. Finally, the social worker reported that the children continued to do well in their placement, and they were receiving appropriate care.

On May 1, 2013, the juvenile court found that J.N. was a dependant of the court under section 300, subdivisions (b) and (j), and it sustained the petition. The court further ordered that J.N. was to remain in the custody of his grandparents. The court also denied reunification services and set a hearing under section 366.26 for the permanent placement of J.N. The court then terminated reunification services for the remaining children and set a hearing under section 366.26 for selection of their permanent placement.

D.     *Background to Section 366.26 Hearing and Termination of Parental Rights*

In a report filed for the section 366.26 hearing, the social worker reported that C.N. said he wanted to stay with his grandmother and was angry at his parents because they would tell him they were coming to visit and then not show up or call. C.N.'s therapist told the social worker that C.N. continued to have issues related to loss and abandonment. D.N. also continued to receive therapy for similar issues. The social worker reported that all six children had adjusted well to their placement with the grandparents and had demonstrated a healthy attachment to them. The social worker also reported the children were affectionate with the grandparents, and the grandparents continued to meet the needs of the children and provided a loving family life. The grandparents also informed the social worker that they were ready to move forward with the adoptions.

With respect to adoptability, the social worker concluded the children were likely to be adopted, but reported C.N. appeared confused about whether he wanted to be adopted or not. C.N. enjoyed a loving relationship with his parents and with his grandparents, as well as with his extended family. The social worker reported that C.N.,

12

D.N., and A.N. complained that the parents failed to show up for visits, which affected the children emotionally. During a visit on May 15, 2013, the social worker observed mother; mother did not go to or hold J.N. the whole time the parents visited the children. C.N. told the social worker he was worried he might have to go back to living with his parents. The following month, the grandmother told the social worker that the parents had only been visiting once a week and, most of the time, they would fail to show up. The social worker recommended that visitation be reduced to once a month to reduce the trauma to the children from missed visits. At a hearing conducted on August 29, 2013, the juvenile court adopted the social worker's recommendation and reduced visitation to once a month.

In an addendum report, the social worker reported the children had been living with their grandparents for 20 months and were well adjusted in their new home. During visits, the social worker observed the grandparents showing love and attention to the children. Although the children were adjusting well, C.N. showed some resistance to staying permanently with his grandparents, and he continued to express his hope that father would find a home so the children could live with him. When C.N. told the social worker he worried about not being able to spend time with his parents, she told him that his adoption by his grandparents would not end his relationship with his parents. The other children told the social worker they liked living with their grandparents. When the children were told adoption by their grandparents would mean they would live there for a long time, they expressed their desire to continue living with their grandparents. The

13

social worker also reported the grandparents had a strong and close bond with the children.

In a final addendum report, the social worker reported the parents' visitation continued to be sporadic and, as a result, the children suffered.

On January 13, 2014, mother filed petitions under section 388 requesting the court set aside its orders terminating reunification services and setting a section 366.26 hearing. She also requested the court grant her additional reunification services. The juvenile court summarily denied the petitions.

During the section 366.26 hearing on January 14, 2014, counsel for mother asked the juvenile court to consider guardianship for the children instead of adoption. Counsel relied on the benefit exception, contending C.N.'s resistance to adoption and his hope to reunify with his parents showed that a close bond existed. Counsel also argued that mother had maintained visitation with the children. The juvenile court interjected that mother had only visited occasionally and added that the visits were inconsistent. Nonetheless, counsel argued that mother's visits had been regular when they were scheduled at the grandparents' home, and that termination of parental rights would be detrimental to the children because of the strong bond between them. Father's counsel also argued that the benefit exception applied. Counsel asked that the juvenile court inform the grandmother that she had the discretion to allow continued visitation with the parents if father's parental rights were terminated. Mother's counsel joined in the latter request, and both minors' counsel and counsel for DPSS agreed that the court could permit appropriate visitation after the adoptions.

14

The juvenile court found that the benefit exception in section 366.26, subdivision (c)(1)(B), did not apply because visitation with the parents was inconsistent and at times inappropriate, and because termination of parental rights would not be detrimental to the children. The court therefore terminated mother and father's parental rights. The court authorized appropriate visitation at the discretion of the social worker and caregivers until the adoptions were finalized.

Mother timely appealed.

II.

DISCUSSION

"Section 366.26 provides that if parents have failed to reunify with an adoptable child, the juvenile court must terminate their parental rights and select adoption as the permanent plan for the child. The juvenile court may choose a different permanent plan only if it 'finds a compelling reason for determining that termination [of parental rights] would be detrimental to the child [because]: [¶] (i) The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship.' (§ 366.26, subd. (c)(1)(B)(i).)" (*In re Marcelo B.* (2012) 209 Cal.App.4th 635, 642.)

"Regular visitation exists where the parents visit consistently and to the extent permitted by court orders." (*In re I.R.* (2014) 226 Cal.App.4th 201, 212, citing *In re Brandon C.* (1999) 71 Cal.App.4th 1530, 1537.) "'Sporadic visitation is insufficient to satisfy the first prong . . .' of the exception." (*In re Marcelo B.*, *supra*, 209 Cal.App.4th at p. 643, quoting *In re C.F.* (2011) 193 Cal.App.4th 549, 554.)

15

Mother contends she regularly visited the children from the time they were detained, and argues her visits only tapered off somewhat after the birth of J.N. The uncontested reports in the record support the juvenile court's conclusion that mother's visits were inconsistent and at times inappropriate.

Soon after the children were removed from the parents' custody, mother missed a supervised visit at a park, perhaps due to miscommunication with the grandparents. Although in the status review report filed March 14, 2013, the social worker reported the parents had been visiting the children twice weekly, helped them with their homework, and watched the children's soccer games on weekends, the next month she reported the parents had problems getting to the visits after they were increased two hours each day. Moreover, C.N. told the social worker that the parents had lied to the children about coming to visit. In a report filed for the section 366.26 hearing, the social worker again reported C.N., D.N., and A.N. complained that their parents promised to come for visits but failed to show up, which affected them emotionally. During one visit, the social worker noted mother did not attempt to hold J.N. during the entire visit. As a result of the trauma to the children from the missed visits, the juvenile court adopted the social worker's recommendation and reduced visitation to once a month. And in her final addendum report, the social worker reported the parents' visitation continued to be sporadic, and the children were suffering as a result. On this record, we cannot agree with mother that her visits were consistent.

16

Even if we were to conclude that the record shows mother visited the children consistently, the record supports the juvenile court's conclusion that termination of parental rights will not be detrimental to the children.

The appellate courts are divided on the appropriate standard of review of the juvenile court's conclusion that the benefit exception does not apply. Some courts have applied the abuse of discretion standard while others have applied the substantial evidence test. (See *In re Scott B.* (2010) 188 Cal.App.4th 452, 469.) Recently, some courts have taken a middle approach, applying the substantial evidence test to the juvenile court's factual finding of whether there exists a beneficial parent-child relationship, and applying the abuse of discretion standard to the juvenile court's "''"quintessentially" discretionary decision'" that termination of parental rights will not be detrimental to the child. (*In re K.P.* (2012) 203 Cal.App.4th 614, 621-622, quoting *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1315.) We need not decide which approach is correct because under either standard the juvenile court did not err.

*In re Autumn H.* (1994) 27 Cal.App.4th 567, is the seminal case regarding exceptions to the preference for adoption. There, the court held that parent-child relationships that can prevent termination of parental rights are ones that promote ". . . the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a

17

substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Id.* at p. 575.)

"The exception must be examined on a case-by-case basis, taking into account the many variables which affect a parent/child bond. The age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs are some of the variables which logically affect a parent/child bond." (*In re Autumn H*., *supra*, 27 Cal.App.4th at pp. 575-576.)

Adoption cannot be thwarted simply because a child would derive some benefit from continuing the parent-child relationship, and adoption should be ordered when the court finds that the relationship maintained through visitation does not benefit the child significantly enough to outweigh the strong preference for adoption. (*In re Jasmine D*. (2000) 78 Cal.App.4th 1339, 1350.) The juvenile court may reject a parent's claim simply by finding that the relationship maintained during the visitation does not benefit the child significantly enough to outweigh the strong preference for adoption. To apply the exception, the court must find compelling reasons to apply the exception. Only in an extraordinary case will the preservation of parental rights prevail over the Legislature's preference for adoption. (*Ibid*.)

As mother contends, the record demonstrates the children have a loving relationship with their parents. However, the record does not demonstrate that the children are so strongly bonded to mother that termination of her parental rights would

18

be detrimental to the children. No bonding study was conducted. The record shows that C.N. and D.N. had emotional issues of loss and abandonment because the parents would promise to visit the children, but failed to show up, not because of the prospect of being unable to live with their parents. In contrast, the record contains ample evidence that the children adjusted well during their 20-month placement with the grandparents before the section 366.26 hearing, and the children had formed a strong and loving bond with the grandparents.

Mother contends that C.N.'s confusion about whether or not he wanted to be adopted is evidence that termination of her parental rights would be detrimental to the children. True, C.N. expressed his hope that he would be reunited with his parents, but this must be balanced against C.N.'s statements to the social worker that he was happy living with his grandparents and wanted to stay there because they provided him with a caring and loving home, and they made sure he got to school every day. Indeed, C.N. told the social worker he was worried that he might have to go back with his parents. Therefore, we conclude the record supports the juvenile court's conclusion that termination of parental rights would not be detrimental to the children, and we find no abuse of discretion.

Finally, relying on *In re C.B.* (2010) 190 Cal.App.4th 102 and *In re S.B.* (2008) 164 Cal.App.4th 289, mother contends the juvenile court improperly relied on the prospect of continued visitation after adoption when concluding that termination of parental rights would not be detrimental to the children. We are not persuaded. The juvenile court properly concluded that the children would not benefit from a continued parental relationship with mother when it terminated her rights. Only at the end of the

19

hearing did the court order that the social worker and grandparents had discretion to permit the parents to visit with the children pending finalization of the adoptions. Nothing in the record suggests, let alone establishes, that the prospect of continued visitation with the parents "backboned" the juvenile court's decision. In fact, mother's argument is inconsistent because, as she concedes, although the juvenile court ordered that the grandparents would be given preference over other prospective adoptive parents, there was no guarantee the grandparents would end up being the adopted parents. Even if the grandparents were willing to allow continued visits, other prospective adoptive parents might not be so generous.

## III.

## DISPOSITION

The orders are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

<u>McKINSTER</u>
Acting P. J.

We concur:


<u>MILLER</u>
J.


<u>CODRINGTON</u>
J.

20